FILED

NOT FOR PUBLICATION

APR 06 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No.   CC-11-1248-MkHKi |
| ) | |
| EDWARD GILLIAM, ) | Bk. No.   RS 08-26743-CB |
| ) | |
| Debtor. ) | Adv. Nos. RS 09-01091-CB |
| _____ ) | RS 09-01145-CB |
| ) | |
| MINON MILLER, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **MEMORANDUM**[*] |
| ) | |
| EDWARD GILLIAM, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on February 24, 2012
at Pasadena, California

Filed - April 6, 2012

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Catherine E. Bauer, Bankruptcy Judge, Presiding

_____

Appearances:    Appellant Minon Miller, in propria persona, argued
on her own behalf; Todd Turoci of The Turoci Firm
argued on behalf of Appellee Edward Gilliam.[**]

_____

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[**]At oral argument, appellant Miller orally requested a continuance.  She argued that, if she had known that Turoci was going to appear and argue on behalf of appellee Gilliam, she would have sought counsel to represent her at oral argument. This Panel denied Miller's continuance request.  Unlike hearings that take place in the bankruptcy court, oral argument before

(continued...)

Before: MARKELL, HOLLOWELL and KIRSCHER, Bankruptcy Judges.

## INTRODUCTION

Appellant Minon Miller ("Miller") sued debtor Edward Gilliam ("Gilliam") to have his debt declared nondischargeable under § 523(a)(2)(B)[1] and to revoke his discharge under § 727(d)(1) and (2). The bankruptcy court granted summary judgment in favor of Gilliam on the § 523(a)(2)(B) claim and on the § 727(d)(2) claim, and granted judgment after trial in favor of Gilliam on the § 727(d)(1) claim. The bankruptcy court also granted Gilliam's request for fees pursuant to § 523(d). We AFFIRM.

## FACTS

This matter is the latest installment of a long-running and ugly dispute between the parties. Both sides apparently believe

---

[**](...continued)
this Panel is not considered a formal hearing of record at which evidence may be taken and arguments made for the first time. In deciding appeals, this Panel generally relies on the parties' papers rather than on oral argument. In light of the above, we confirm that Miller's lack of counsel at oral argument did not affect her appeal in any material way.

In any event, on March 16, 2012, Turoci filed a motion to withdraw as counsel. Miller has not objected, and thus we will grant that motion. As a consequence, Gilliam will hereafter be noted on the BAP's docket as representing himself, and his name, address and telephone number as provided by his former counsel will be listed on the BAP docket. Gilliam's name, address and telephone number shall henceforth be used in this appeal for service of notice and other papers on Gilliam.

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure, and all "Evidence Rule" references are to the Federal Rules of Evidence.

that good advocacy is measured by the amount of words used. Hundreds upon hundreds of mostly irrelevant pages of invective and philippic have been filed, some of which were improper.[2] While we have reviewed the entire record, we must note the obvious: this form of advocacy is, at best, counterproductive.

The parties' internecine fighting has affected this appeal. To maintain order, this Panel entered an order before oral argument barring the parties from filing unauthorized and successive briefs, and from filing "new" evidence to support their claims and contentions.[3] We continue that order with the entry of this memorandum; other than a motion for rehearing under rule 8015, any opposition to that motion, and any notice of appeal, the parties may not file anything further in this appeal. And any paper that is filed must not exceed 15 pages of argument, and may not have more than 25 pages in the aggregate of exhibits (not counting any necessary attachments to any notice of appeal). Any papers not complying with these restrictions will be returned to that party unfiled.

As to the merits, the facts are relatively simple. The

---

[2]On November 29, 2011, the Panel issued an order requiring that the excerpts of the record would be imaged by the BAP Clerk and made available for public view on the electronic docket. A review of these excerpts indicated that they contained sensitive personal information, including bank account numbers. See BAP Docket at 22. The Panel has a duty to protect against unauthorized use of this information. See Rule 9037. Accordingly, appellant's excerpts of the record at BAP docket number 22 will be locked on the electronic docket and will not be available for public view.

[3]As might be expected, Gilliam moved to reconsider that motion as well, and included arguments on the merits of his appeal in that brief.

3

dispute between Miller and Gilliam arises from a "Lease with Purchase Option" agreement ("Agreement") they entered into in March 2007. Under the Agreement, Miller was to rent from Gilliam, for a period of one year, a single-family residence located in Carson, California ("Carson Property"). The agreed monthly rent was $3,300. The Agreement also gave Miller the option to purchase the Carson Property for $825,000 or "market price," whichever was lower.

Miller had learned of the Carson Property from a newspaper advertisement ("Advertisement"), which identified the Carson Property as follows:

> **GORGEOUS 5-BEDROOM 3 BATH** CARSON Home. Lease Option. Fireplace. Portion Rental Payment goes toward Down Payment.

Declaration of Minon Miller ("Miller Decl.") (Sep. 28, 2010) at Ex. 1 (emphasis in original).

But all was not well at the Carson Property. According to Miller, within a few weeks after she signed the Agreement, she discovered that the property was in "bad condition." Among other things, she complained that there was no heat, no thermostat, inadequate hot water, missing door knobs, a broken toilet and a broken front door lock.[4]

More serious problems existed. For instance, one of the five bedrooms was an unpermitted addition that, according to Miller, was poorly constructed, ill-maintained and uninhabitable.

---

[4]Miller met with Gilliam at the Carson Property before she entered into the Agreement, but she claimed that she did not notice the problems until she moved in.

4

Notwithstanding all the problems, Miller still sought to exercise her option to purchase the Carson Property. In November 2007, she sent a letter attempting to exercise the option for a strike price of $578,000, claiming that $578,000 was the market value of the property. She also, however, added conditions to her attempted exercise of the option. Among other things, the conditions included: (1) Gilliam fixing the preexisting problems, (2) Miller obtaining financing, and (3) satisfactory reports on the property's condition from a home inspector and the City of Carson. In December 2007, Gilliam sent a letter to Miller rejecting her November 2007 purchase offer, claiming that her purchase offer did not comply with the option in the Agreement.

According to Miller, Gilliam never intended to sell the Carson Property to her, that the Agreement with the purchase option was just a scam to induce her to rent a substandard property at an inflated price. Miller further contended that, at the time Gilliam was supposedly bound by the option, he nonetheless continued to market and list the Carson Property for sale.

The dispute over the Carson Property spawned a number of state court lawsuits. Miller filed two small claims lawsuits against Gilliam (Case Nos. COM 08S01715 and COM 08S01716) ("Small Claims Cases"). She also filed a complaint in Los Angeles Superior Court for, among other things, breach of contract, fraud, and intentional and negligent infliction of emotion distress, all allegedly arising from the parties' dealings in relation to the Carson Property (LASC Case No. BC382802). Meanwhile, Gilliam filed his own Los Angeles Superior Court

5

action against Miller for breach of contract, intentional interference with prospective economic advantage, and intentional interference with contractual relationship (LASC Case No. BC398630). Gilliam also filed two unlawful detainer actions against Miller (Case Nos. 08Q01024 and 08Q02108) ("Unlawful Detainer Cases").[5]

Gilliam filed his current chapter 7 bankruptcy case (Case No. 08-26743) in November 2008, and Christopher Barclay was appointed to serve as trustee ("Trustee"). Gilliam filed his initial bankruptcy schedules and statement of financial affairs in December 2008 ("December Schedules"), and filed amendments to some of his schedules in January 2009 ("January Schedules"). On January 26, 2009, the Trustee concluded Gilliam's § 341(a) meeting of creditors, and on February 3, 2009, the Trustee filed a no-asset report in which he certified that he had performed his duties as trustee and had concluded there were no estate assets for him to administer for the benefit of creditors. The bankruptcy court entered Gilliam's discharge pursuant to § 727(b)

[5]It is not clear from the record whether the parties fully advised the bankruptcy court of the status or outcome (if any) of these state court actions at or before the time the court entered the orders on appeal. Although the parties' papers characterized the status and supposed outcomes of some of these actions, the characterizations often conflicted. Despite these conflicts, neither party appears to have given the bankruptcy court authoritative documentation corroborating their respective characterizations. In any event, the status/outcomes of the state court actions are not essential to our analysis and resolution of this appeal.

on March 9, 2009.[6]

In his December Schedules, Gilliam disclosed that he owned four parcels of real property, as follows:

Property Located at: 716 West 123rd Street, Los Angeles, CA
Current Value: $434,000; Encumbrances: $711,892

Property Located at: (Duplex) 1146 & 1148 East 21st, Long Beach, CA
Current Value: $411,000;  Encumbrances: $517,000

Primary Residence located at: 19426 Via Del Caballo, Yorba Linda, CA
Current Value: $2,273,500;  Encumbrances: $2,723,057

Property Located at: 19002 Kemp Avenue, Carson, CA [the Carson Property]
Current Value $480,500;  Encumbrances: $659,472

Schedule A listing of real property (Dec. 10, 2008) at p. 1.[7]

---

[6]Notwithstanding the voluminous record provided by the parties, we obtained some of the basic information regarding Gilliam's bankruptcy case by accessing the bankruptcy court's electronic docket and reviewing the imaged documents attached thereto.  We can take judicial notice of the filing and contents of these items.  See Barnes v. Belice (In re Belice), 461 B.R. 564, 569 n.2 (9th Cir. BAP 2011).

[7]The Trustee evidently was aware of the existence of all of these properties.  However, nothing in the record indicates what the Trustee knew about Gilliam's efforts to rent some of these properties.  Presumably, the Trustee would have inquired about them at the § 341(a) meeting of creditors, and possibly contacted Gilliam outside the meeting of creditors about them, but conspicuously absent from the record is any indication about the Trustee's discussions regarding these properties, their potential rental value, and their worth (if any) to the estate.  We do know that the Trustee in his no asset report concluded that there were no assets of value for him to administer for the benefit of creditors.  We also know from Gilliam's Statement of Intention Regarding Debts Secured by Property of the Estate that he intended to retain each of the properties and to make the mortgage payments owed on each of them.  Various filings in the bankruptcy case suggest that most of the properties were subject to foreclosure proceedings at or around the time of Gilliam's bankruptcy filing.

7

Also in his December Schedules, Gilliam represented he was the sole shareholder of two corporations, Gold Diamond Enterprises, Inc. and ERG Community Care, Inc. Gilliam further represented that Gold Diamond owned two automobiles, each with roughly 50,000 miles on it. Otherwise, Gilliam indicated that these corporations held no assets of significant value. In his January Schedules, in addition to Gold Diamond and ERG Community Care, Gilliam listed fourteen additional corporations he owned (collectively, "Business Affiliates"). According to Gilliam, none of the fourteen additional Business Affiliates had any assets or value, nor had they done any business.

On February 27, 2009, Miller filed a complaint seeking a determination of nondischargeability of debt ("Nondischargeability Complaint"), and on March 30, 2009, a complaint to revoke Gilliam's discharge ("Complaint to Revoke"). The bankruptcy court consolidated these two adversary proceedings by order entered October 27, 2009. The Nondischargeability Complaint was based on the dispute over the Carson Property and contained a single claim for relief under § 523(a)(2)(B). Meanwhile, in the Complaint to Revoke, Miller alleged that Gilliam misrepresented and omitted certain assets and income in his schedules and statement of financial affairs. More specifically, Miller alleged that, under § 727(d)(1) and (2), Gilliam's discharge should be revoked, based in part on the following alleged facts:

> 1. Debtor declared under false oaths, that he had "No Assets" including income or cash to pay any Creditor yet he purchased a Builders Permit to remove an unpermitted upstairs bedroom and build a gable roof for [the Carson] property . . . before discharge was

8

issued.

2.   Debtor declared "No Assets" including income or cash to pay Creditors yet debtor restored property of the estate [the Carson Property], solicited new tenant, collected deposit and rent from new tenants [later identified as Frieda and William Jordon].

3.   Statements submitted by Debtor as well as testimony, states all property is in foreclosure with no payment given to any lender yet Debtor has collected deposits and rents without permission of the Court or the Trustee.

4.   Debtor intentionally concealed income from Sports Entertainment Business, under Gold Diamond Enterprises, LLC.

5.   Debtor intentionally concealed income as a Sports Agent under Gold Diamond Enterprises, LLC.

6.   Debtor intentionally misstated income ($23,000.00) a month generated from Gold Diamond Enterprise Inc. derive from "Property Management that consist of collecting rent from one property located at 716 E 123rd St., Los Angeles, CA 90746, which is a single family home.

7.   Debtor intentionally submitted false Statement of Financial Affairs.

8.   Debtor submitted false testimony and submitted false schedules that income source is from Gold Diamond Enterprises Inc. (Property Mgmt) and Non Profit Shelter (ERG Community Care, Inc.).

9.   On February 12, 2009 while awaiting discharge of "No Asset" Chapter 7, debtor paid for and obtained a Builder's Permit Extension from the City of Carson to remove unpermitted bedroom and build gable roof [for the Carson Property].

10.   While in bankruptcy awaiting discharge, and declaring "No Assets", Debtor repaired vacant property and prepared to enter into new lease agreement. Vacant property required major repairs that are deemed inhabitable due to unpermitted unsafe bedroom, visible cracks in the walls and ceiling, leaks, inadequate plumbing, and slow drains [again, apparently talking about the Carson Property].

11.   While in bankruptcy debtor negotiated new tenants, collected deposit and rent from the new tenants (the Jordons) before obtaining discharge.

9

12. On March 20, 2009 debtor arrived at newly repaired [Carson] property driving a Black Mercedes that was not included in Bankruptcy schedules to give his tenants (the Jordons) the key to the [Carson] property . . . and sign lease agreement which was later signed March 23, 2009.

Complaint (Mar. 30, 2009) at pp. 2-4.[8]

The discovery process was highly contentious. The parties filed numerous discovery motions, and the discovery deadline was continued several times. Some (but certainly not all) of the papers relating to the parties' discovery motions are included in the excerpts of record. We have reviewed those papers, as well as others, by accessing the bankruptcy court's electronic docket. In addition, transcripts from a few of the discovery hearings are available. Neither party has challenged on appeal the court's rulings on their respective discovery motions, so the specifics of each discovery motion are not material to our resolution of this appeal.[9]

In September 2009, Gilliam filed a separate summary judgment

[8]Miller filed both of the complaints in pro se, but she retained counsel by no later than April 2009, and she was represented by counsel throughout the remainder of the bankruptcy court litigation, including all discovery disputes, during the summary judgment proceedings, and at all hearings.

[9]Miller argues on appeal that her ability to prosecute her case and collect evidence was hampered by Gilliam's obstructive discovery tactics. In addition, Miller contends that the court did not adequately take into account Gilliam's obstructive discovery tactics in assessing the reasonableness of his request for fees under § 523(d). But the outcome of the discovery motions tells a slightly different story. Looking at all of them as a whole, Miller lost more than she won, which suggests, at a minimum, that both parties at times were less than reasonable in their discovery practices.

10

motion in each adversary proceeding.  Both were continued from time to time and eventually taken off calendar pending the completion of discovery.  In June 2010, after the court's consolidation of the two adversary proceedings, Gilliam filed a new summary judgment motion, covering the claims alleged in both adversary proceedings.

By June 2010, discovery was substantially completed. Gilliam's deposition was completed that same month, and the only discovery outstanding after that were subpoenas for various records that Miller served on Gilliam's banks and his Business Affiliates.  Gilliam brought several motions to quash these subpoenas, and the court granted all but one:  Miller's subpoena to Bank of America seeking Gilliam's bank records was not quashed.  According to Miller, she did not receive Gilliam's bank records from Bank of America ("Bank Records") until September 21, 2010, the day before her opposition to Gilliam's summary judgment motion was due, and fifteen days before the hearing on the summary judgment motion.  The court denied Miller's motion to further continue the summary judgment hearing.

Miller belatedly filed her opposition to the summary judgment motion on September 28, 2010,[10] and the court held its

---

[10]In her excerpts of record, Miller did not provide us with the 800-page request for judicial notice she filed in the bankruptcy court in support of her summary judgment opposition. By order entered October 7, 2010, the bankruptcy court restricted public access to the judicial notice request presumably because of concerns raised at the October 6, 2010 hearing, and in a motion to strike filed by Gilliam, that the judicial notice request might contain unredacted information to which Gilliam might be entitled to some measure of privacy.

(continued...)

11

initial hearing on the summary judgment motion on October 6, 2010. At the hearing, the court ruled against Miller on her § 523(a)(2)(B) claim, primarily because neither of the two documents on which Miller based her § 523(a)(2)(B) claim – the Advertisement and the Agreement – constituted a statement respecting the debtor's financial condition within the meaning of § 523(a)(2)(B). The court indicated that it was inclined to grant the remainder of the summary judgment motion, but that it would give Miller ten more days to file a supplemental brief of

---

[10](...continued)

Miller apparently misinterpreted the court's order restricting public access as somehow restricting her from providing us with a copy. Further, we have not been able to obtain a copy of the judicial notice request by simply accessing the bankruptcy court's electronic adversary proceeding docket (presumably because of the bankruptcy court's order restricting access to this document).

Nonetheless, we have reviewed Miller's comments regarding the contents of the judicial notice request included in her appeal brief and in her September 28, 2010 Declaration in support of her summary judgment opposition. These comments indicate that many (if not most) of the documents attached to the judicial notice request were documents that the bankruptcy court could not properly take judicial notice of under Evidence Rule 201. Among other things, the judicial notice request contained the 363 pages of Bank Records produced by Bank of America. Miller has made all of the Bank Records available to us elsewhere in the Excerpts of Record, as they also were part of her submissions at the time of trial. The judicial notice request also apparently contained: (1) a declaration filed by Gilliam in a state court lawsuit; (2) excerpts from Gilliam's deposition testimony; (3) A notice of default on the Carson Property; (4) a history of Gilliam's mortgage payments on the Carson Property; and (5) various other documents from the state court litigation between Miller and Gilliam.

Based on our review of the Bank Records and on Miller's description of the other documents, we conclude that none of them would alter our analysis and disposition of the court's summary judgment rulings.

no more that 25 pages (including exhibits) pinpointing the disputed facts and Miller's evidence demonstrating that there were genuine issues concerning her § 727(d) claims. On October 22, 2010, the court entered an order consistent with its October 6, 2010 oral rulings.[11]

After the parties filed their supplemental briefs, the court entered an order on November 3, 2010, granting summary judgment against Miller on her § 727(d)(2) claim. As the court put it, "Gilliam met his burden of proving no genuine issue of material fact that Gilliam acquired and failed to disclose property to the Trustee, and Miller has failed to provide any evidence showing a genuine issue of material fact." Order Granting Summary Judgment In Part (Nov. 3, 2010) at 2:28-3:2.

Indeed, Miller's only fact related to the alleged postpetition acquisition of estate assets was Gilliam's apparent receipt of $3,000 in rent from Frieda and William Jordon – the subsequent renters of the Carson Property. Significantly, Miller did not refer to any issue of fact regarding whether Gilliam attempted to conceal the $3,000 in rent from the Trustee, nor did Miller present any evidence pertaining to this issue.

The court held an additional hearing on the summary judgment motion on November 29, 2010, specifically concerning Miller's sole remaining claim, the § 727(d)(1) claim. At the hearing, the court heard testimony regarding whether Gilliam had a fraudulent

---

[11]The court further suggested at the October 6, 2010 hearing that "res judicata" might be an alternate basis for its ruling on the § 523(a)(2)(B) claim. In light of our analysis and disposition of this appeal, we do not reach that issue.

13

intent when he omitted or misrepresented certain information in his bankruptcy schedules. The court also heard at this same hearing Gilliam's § 523(d) request for fees.

Ultimately, the court denied Gilliam's motion for summary judgment with respect to Miller's § 727(d)(1) claim, concluding that there were disputed issues of fact that needed to be tried. However, the court granted Gilliam's § 523(d) fee request for the full amount requested – $27,788.24. The court based its fee award on its finding that Miller's § 523(a)(2)(B) claim was not well founded and its finding that the amount of fees requested were reasonable.

On December 20, 2010, the court entered an order setting March 22, 2011 as the trial date and setting forth certain trial procedures. In pertinent part, the order required the parties to submit all direct testimony by declaration, and to have all witnesses giving testimony by declaration available at trial for cross-examination.

The court ruled against Miller on her § 727(d)(1) claim after a trial held on March 22, 2011. The primary basis for the court's ruling was its finding that Miller did not prove by a preponderance of the evidence that Gilliam had any fraudulent intent with respect to any errors or omissions in his bankruptcy schedules or in his statement of financial affairs. But the court also found it significant that there was no testimony or other evidence from the Trustee or anyone else demonstrating that any of the so-called errors or omissions would have impacted the administration of the estate or caused the Trustee to seek denial of Gilliam's discharge.

14

Finally, the court stated:

> Just a little bit of a follow up, there was no foundation laid for Exhibit 1 [the Bank Records] to the extent that they are bank records. There was no connection made between any of these numbers in anything that I could pinpoint to indicate what it meant. I mean there was no connection made between certain numbers in this Exhibit 1 and anything that would lead me to believe there was fraud.

Hr'g Tr. (Mar. 22, 2011) at 62:7-14.

The court entered its final judgment on April 19, 2011, and Miller timely appealed on May 18, 2011.[12]

### JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)(2)(I) and (J), and we have jurisdiction under 28 U.S.C. § 158.

### ISSUES

1. Did the bankruptcy court commit reversible error in its summary judgment rulings?

2. Did the bankruptcy court commit reversible error in its rulings at and after trial?

3. Did the bankruptcy court commit reversible error when it awarded Gilliam attorneys fees under § 523(d)?

### STANDARDS OF REVIEW

We review the bankruptcy court's decision to grant summary judgment de novo. Fichman v. Media Ctr., 512 F.3d 1157, 1159 (9th Cir. 2008).

---

[12]A motions panel of this Panel previously issued an order concluding that, by operation of Civil Rule 58(c)(2)(B) (made applicable in adversary proceedings by Rule 7058), Miller timely filed her notice of appeal.

Factual findings made by the bankruptcy court after trial on a discharge revocation claim are reviewed under the clearly erroneous standard of review. See Rule 8013; Bowman v. Belt Valley Bank (In re Bowman), 173 B.R. 922, 924 (9th Cir. BAP 1994). A factual finding is clearly erroneous if the appellate court determines that it is "illogical, implausible, or without support in the record." Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010) (citing United States v. Hinkson, 585 F.3d 1247, 1261-62 & n. 21 (9th Cir. 2009) (en banc)). If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous. Anderson v. Bessemer City, N.C., 470 U.S. 564, 574 (1985).

We review the bankruptcy court's evidentiary rulings and its imposition of discovery sanctions for abuse of discretion. See Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1105-06 (9th Cir. 2001). "We afford broad discretion to a district court's evidentiary rulings. To reverse such a ruling, we must find that the district court abused its discretion and that the error was prejudicial. A reviewing court should find prejudice only if it concludes that, more probably than not, the lower court's error tainted the verdict." Harper v. City of Los Angeles, 533 F.3d 1010, 1030 (9th Cir. 2008)(citations and internal quotation marks omitted).

Section 523(d) awards also are reviewed for abuse of discretion. First Card v. Hunt (In re Hunt), 238 F.3d 1098, 1101 (9th Cir. 2001) (citing First Card v. Carolan (In re Carolan), 204 B.R. 980, 984 (9th Cir. BAP 1996)).

Under the abuse of discretion standard of review, we first

"determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." Hinkson, 585 F.3d at 1262. And if the bankruptcy court identified the correct legal rule, we then determine under the clearly erroneous standard whether its factual findings and its application of the facts to the relevant law were: "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. (internal quotation marks omitted).

**DISCUSSION**

**I.   The Bankruptcy Court Did Not Commit Reversible Error in its Summary Judgment Rulings.**

   **A.   General Summary Judgment Standards**

   "Summary judgment is proper if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); see also Sluimer v. Verity, Inc., 606 F.3d 584, 586 (9th Cir. 2010). Under this standard, the moving party is entitled to summary judgment if the nonmoving party "after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322; see also Ilko v. Cal. St. Bd. Of Equalization (In re Ilko), 651 F.3d 1049, 1052 (9th Cir. 2011) (applying Celotex summary judgment standard to bankruptcy court adversary proceeding). As explained in Celotex, all other facts

17

are immaterial when the nonmoving party fails to submit sufficient proof of an essential element of its case. Id. at 323.

A mere "scintilla of evidence" is not sufficient; "there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Thus, the moving party does not need to negate or disprove matters on which the nonmoving party will have the burden of proof at trial. Celotex Corp., 477 U.S. at 325. Rather, the moving party need only point out that there is an absence of evidence to support an element of the nonmoving party's case. Id.

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party, "and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (emphasis added). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment . . . ." Id. (emphasis added); see also Sluimer, 606 F.3d at 586-87. In sum, evidence of an essential element is sufficient to defeat summary judgment only if a jury reasonably could infer from that evidence the existence of that element.

**B.    Ruling on Section 523(a)(2)(B) Claim**

Miller asserts that the bankruptcy court erred when it granted summary judgment against her on the § 523(a)(2)(B) nondischargeability claim. Under that section, when the debtor uses a materially false written statement "respecting the

18

debtor's . . . financial condition" with the intent to deceive, and thereby incurs a debt, that debt is nondischargeable. § 523(a)(2)(B); see also Field v. Mans, 516 U.S. 59, 64 (1995). To lead to nondischargeability under § 523(a)(2)(B), the creditor must reasonably rely on the false written financial statement, and the statement must induce the creditor to give the debtor money, property or services, or to extend credit. Id. at 64-66. Here, in granting summary judgment, the bankruptcy court concluded as a matter of law that neither of the two documents on which Miller founded the § 523(a)(2)(B) claim – the Advertisement and the Lease – constituted a statement "respecting the debtor's . . . financial condition" within the meaning of § 523(a)(2)(B). According to Miller, the bankruptcy court erred in so concluding. But we agree with the bankruptcy court.  As we recently held in In re Belice, 461 B.R. at 577-79, the phrase "statement respecting financial condition" as used in § 523(a)(2)(B) should be narrowly construed to apply only to statements reflecting debtors' net worth, overall cash flow, or overall financial condition.  Simply put, given the content of the Advertisement and the Lease, we cannot conceive of either document as a "statement respecting the debtor's . . . financial condition" within the meaning of that phrase as we determined in Belice.

Consequently, the bankruptcy court did not err when it granted summary judgment against Miller on the § 523(a)(2)(B) claim.

**C.  Ruling on § 727(d)(2) Claim**

Miller also asserts that the bankruptcy court erred when it granted summary judgment against her on the § 727(d)(2)

19

revocation of discharge claim. A debtor's discharge will be revoked under that section when the debtor (1) acquired or became entitled to acquire estate property, and (2) knowingly and fraudulently failed to report or turnover that property to the trustee. § 727(d)(2); In re Bowman, 173 B.R. at 925 (citing In re Yonikus, 974 F.2d 901, 905 (7th Cir. 1992)). Miller bore the burden of proof to establish by a preponderance of evidence the elements supporting the § 727(d)(2) claim. Id. at 925-26.

Here, the only evidence Miller presented of Gilliam acquiring postpetition an asset of the estate was $3,000 in rent from the Carson Property. More importantly, however, Miller presented no evidence at all that the Trustee was unaware of the $3,000 in rent. Given the complete absence of evidence to demonstrate that Gilliam attempted to conceal the rent,[13] and the complete absence of evidence to demonstrate that Gilliam acquired or became entitled to acquire any other estate assets postpetition, the bankruptcy court properly granted summary judgment against Miller on the § 727(d)(2) claim.

**D. Other Summary Judgment-Related Issues**

Miller's other arguments attacking the court's summary judgment rulings lack merit. Miller argues that she was not given enough time to oppose Gilliam's summary judgment motion. In particular, she points out that she only received the Bank

---

[13]A similar absence of evidence in Bowman led us to reverse a bankruptcy court judgment after trial revoking the debtor's discharge under § 727(d)(2). Id. at 926. As we explained there, without some evidence that Bowman attempted to conceal the subject insurance proceeds from the trustee, there simply was no basis to revoke Bowman's discharge under § 727(d)(2). Id.

20

Records from Bank of America the day before her summary judgment opposition was due. However, Gilliam's summary judgment motions already had been continued numerous times. Moreover, no amount of additional time would have improved Miller's legal argument that the Lease and the Advertisement were financial statements within the meaning of § 523(a)(2)(B). As for her § 727(d)(2) claim, Miller learned no later than June 2010, when she completed Gilliam's deposition, that Gilliam received $3,000 in rent from the Jordons when he rented the Carson Property to them postpetition. Miller has not explained why, when over three months elapsed between the completion of the Gilliam deposition and her filing of her opposition to the summary judgment motion, she did not have sufficient time to seek from the Trustee some sort of statement regarding whether he was aware of the $3,000 in rent from the Carson Property. To the contrary, our review of the record indicates that Miller had more than ample time to gather the evidence she needed to support her § 727(d)(2) claim, but she simply failed to do so.

Miller also argues that the bankruptcy court unduly restricted her when it limited her to a 25-page supplemental brief to shore up her opposition to Gilliam's summary judgment motion. We disagree. The court already had ruled against Miller on her § 523(a)(2)(B) claim, and the court made clear that the purpose of the supplemental brief was to afford Miller with an additional opportunity to simply point to what evidence supported her claims under § 727(d)(1) and (2). Moreover, this supplemental brief was in addition to the voluminous materials that Miller submitted in her original opposition papers. In any

21

event, Miller has offered no credible explanation why she was not afforded a sufficient opportunity to present all evidence that would have supported her § 727(d)(2) claim. The record reflects that the bankruptcy court provided Miller with an adequate opportunity to present the evidence in support of her § 727(d)(2) claim, but that Miller simply did not have any evidence to submit in support of one of the essential elements of that claim – evidence that the Trustee was unaware of $3,000 in rent that Gilliam apparently received.[14]

Miller makes reference to several other arguments challenging the court's summary judgment rulings. She complains: (1) that the court expressly refused to read the entirety of the voluminous papers she submitted in opposition to the summary judgment motion; (2) that the court denied her due process; (3) that the court improperly excluded some of the Bank Records she sought to submit in opposition to the summary judgment

---

[14]Together with her Reply Brief on appeal, Miller attempts to offer new evidence, which she claims demonstrates additional instances when Gilliam postpetition may have acquired or become entitled to acquire additional assets of the estate. See Miller Reply (Dec. 22, 2011) at pp. 12-13; Miller Supplemental Excerpts of Record in Support of Reply (Dec. 22, 2011) at Tabs 65A, 67A, etc. However, it is clear on the face of the documents Miller attempts to offer as new evidence that she acquired these documents well after the bankruptcy court entered its final judgment against Miller. We cannot and will not consider Miller's new evidence because it was not presented to the bankruptcy court at or before the time the bankruptcy court entered its judgment. See Oyama v. Sheehan (In re Sheehan), 253 F.3d 507, 512 n.5 (9th Cir. 2001) ("[E]vidence that was not before the lower court will not generally be considered on appeal."); Kirschner v. Uniden Corp. of Am., 842 F.2d 1074, 1077-78 (9th Cir. 1988) (papers not filed or admitted into evidence by the trial court prior to judgment on appeal were not part of the record on appeal and thus stricken).

motion; (4) that the court improperly restricted public access to her request for judicial notice submitted in opposition to the summary judgment motion; (5) that the court improperly allowed Gilliam's counsel to argue on Gilliam's behalf at various hearings even after he purported to withdraw as Gilliam's counsel; and (6) that the court improperly allowed Gilliam's counsel to draft proposed orders, findings of fact and conclusions of law.  But most of these complaints are derivative of Miller's other arguments, discussed and rejected above.  More importantly, none of these complaints, even if they were valid, would alter or ameliorate the infirmities and gaps in Miller's case that properly caused the court to grant summary judgment against her § 523(a)(2)(B) and § 727(d)(2) claims.  In other words, any actual error of the court relating to Miller's above-referenced complaints was harmless, and we must ignore harmless error.  See Litton Loan Serv'g, LP v. Garvida (In re Garvida), 347 B.R. 697, 704 (9th Cir. BAP 2006) (citing 28 U.S.C. § 2111, Rule 9005, Civil Rule 61, and Donald v. Curry (In re Donald), 328 B.R. 192, 203-04 (9th Cir. BAP 2005)).

**II.  The Bankruptcy Court Did Not Commit Reversible Error in its Rulings at and After Trial.**

     **A.  Ruling on § 727(d)(1) Claim**

     Even though a discharge in bankruptcy is reserved for the "honest but unfortunate debtor," Grogan v. Garner, 498 U.S. 279, 286-87 (1991), revocation of discharge nonetheless is considered an extraordinary remedy that runs counter to the Bankruptcy Code's cornerstone policy of giving debtors a "fresh start."  In re Bowman, 173 B.R. at 924; see also Tighe v. Valencia (In re

23

Guadarrama), 284 B.R. 463, 469 (C.D. Cal. 2002); In re Poole, 177 B.R. 235, 239 (Bankr. E.D. Pa. 1995). Accordingly, the power to revoke the discharge is construed narrowly "in favor of the debtor and strictly against those objecting to discharge." Bowman, 173 B.R. at 925 (citing First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986)).

Under § 727(d)(1), the trustee or a creditor may seek revocation of the debtor's discharge if: (1) the debtor obtained the discharge through fraud, and (2) the creditor or trustee seeking to revoke the discharge did not learn of the fraud until after the discharge was granted. To revoke the debtor's discharge pursuant to this statute, the plaintiff must prove by a preponderance of the evidence that the debtor procured the discharge through actual fraud, as opposed to constructive fraud, and that debtor's discharge would not have been granted but for the fraud. See Hopkins v. Hugues (In re Hugues), 349 B.R. 72, 78 (Bankr. D. Idaho 2006) (citing White v. Nielsen (In re Nielsen), 383 F.3d 922, 925 (9th Cir. 2004), Bowman 173 B.R. at 925, and Devers v. Bank of Sheridan, Mont. (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985)); In re Guadarrama, 284 B.R. at 469. Thus, a finding of fraud in the procurement requires evidence of some conduct that under § 727(a) would have been sufficient grounds for denying a discharge in the first instance, such as debtor knowingly and fraudulently making a false oath in connection with his bankruptcy case. See 727(a)(4)(A); In re Hugues, 349 B.R. at 78.

In this case, Miller offered little evidence from which the bankruptcy court could infer that Gilliam harbored a fraudulent

24

intent in the process of obtaining his discharge. Instead of calling Gilliam as a hostile witness as part of her case in chief, Miller only elicited testimony from Gilliam on cross-examination, after Gilliam offered his direct testimony by declaration as part of his defense.[15]

In his trial declaration, Gilliam discussed: (1) his receipt shortly before his bankruptcy filing of some payments from the Compton Unified School District ("School District Payments"); (2) his ownership of several bank accounts not disclosed in his bankruptcy schedules; and (3) his ownership of several of the Business Affiliates – The Watershed, Inc., Pro Sports Now, Gold Diamond Enterprises, and Eirne Consolidated. Gilliam's statements in his trial declaration regarding these Business Affiliates are consistent with his January Schedules. As for the bank accounts, Gilliam represented that he did not disclose them because each held only a few dollars, or no money at all, at the time of his bankruptcy filing. Finally, with respect to the School District Payments, Gilliam explained that they were either disability payments or reimbursement for medication he purchased. According to Gilliam, he disclosed them in his bankruptcy petition but did not list them as income, because in his view they were not income.

Miller's cross-examination of Gilliam focused heavily on the Bank Records, but Miller failed to tie any of the Bank Records to

_____

[15]By not calling Gilliam as a witness as part of her case in chief, Miller effectively limited the scope of her examination of Gilliam to the scope allowed for cross-examination. See Evidence Rule 611(b).

25

any specific conduct by Gilliam from which the bankruptcy court could infer fraud in the procurement of Gilliam's discharge. In other words, Miller's questions and assertions regarding the Bank Records ultimately did not adduce any evidence tending to prove any particular misconduct on the part of Gilliam in connection with his bankruptcy case.

Miller also cross-examined Gilliam regarding the unreported bank accounts, the School District Payments, and Gilliam's claim that the above-referenced Business Affiliates were inactive and had no assets at the time of his bankruptcy filing. While it was not discussed in Gilliam's declaration, Miller also cross-examined Gilliam regarding his state court lawsuit against a man by the name of Wendell White seeking roughly $24,000 ("White Lawsuit").

In sum, the alleged instances of fraudulent misrepresentation or omission covered during Miller's cross-examination of Gilliam at trial related to: (1) the School District Payments, (2) the unreported bank accounts, (3) some of Gilliam's Business Affiliates, and (4) the White Lawsuit.

Based on the evidence presented at trial, the bankruptcy court found in relevant part that any errors or omissions that Gilliam made in his bankruptcy schedules, in his statement of financial affairs or in his other bankruptcy disclosures, were made without the requisite fraudulent intent. As mentioned above, Miller heavily relied on the Bank Records in support of her position at trial, but the best evidence in this record regarding Gilliam's intent was his trial testimony. Intent is a question of state of mind, which often is determined based on the

trier of fact's assessment of the litigant's credibility, which in turn largely depends on the in-court statements of the person whose state of mind is at issue. See, e.g., Hernandez v. New York, 500 U.S. 352, 364-65 (1991); Batson v. Kentucky, 476 U.S. 79, 98 & n.21 (1986).

Gilliam's testimony enabled the bankruptcy court to make an informed assessment of his credibility. While the bankruptcy court did not expressly state that Gilliam's testimony was credible, that finding was subsumed within the court's finding that Gilliam did not have a fraudulent intent to the extent his bankruptcy disclosures contained any errors or omissions. We must give particular deference to the bankruptcy court's findings that turn on witness credibility. See Anderson, 470 U.S. at 574-75; Rule 8013.

Furthermore, as we stated at the outset, we will not reverse the bankruptcy court's factual findings unless those findings were illogical, implausible or without support in the record. In re Retz, 606 F.3d at 1196; see also Anderson, 470 U.S. at 574 (stating that trial judge's choice between two permissible views of the evidence cannot be clearly erroneous). Miller has not demonstrated on appeal that the bankruptcy court's finding concerning Gilliam's intent met any of the criteria identified in Retz. To the contrary, based on our review of the record, we affirmatively and expressly conclude that the bankruptcy court's intent finding was logical, plausible and adequately supported by the record.

In light of our determination upholding the bankruptcy court's finding that Gilliam did not have a fraudulent intent,

27

and given that fraudulent intent was an element essential to Miller's § 727(d)(1) claim, we decline to discuss any of the court's other findings of fact concerning the § 727(d)(1) claim. The court's finding of lack of fraudulent intent was sufficient by itself to support the court's judgment against Miller on the § 727(d)(1) claim.

**B. Ruling Excluding Miller's Expert Witness**

Miller also challenges the bankruptcy court's decision to exclude the direct testimony of her expert witness Shari Yaros, a forensic accountant. The bankruptcy court excluded Yaros' testimony essentially because Miller did not comply with Civil Rule 26(a)(2), which required advance disclosure of Yaros as an expert and advance production of Yaros' expert report. In her declaration, Yaros reviewed the Bank Records, outlined their contents, and rendered an extremely limited expert opinion regarding what the Bank Records showed in terms of Gilliam's financial activities and his relationship to some of the Business Affiliates. In essence, Yaros summarized the flow of funds into and out of Bank of America Account Number 1801, and identified some of the sources and recipients of funds from Account Number 1801 as some of Gilliam's Business Affiliates. But, significantly, Yaros did not render any opinion that the funds flowing into or out of Account No. 1801 somehow demonstrated any type of bankruptcy-related misconduct on the part of Gilliam.

We cannot conclude that the bankruptcy court abused its discretion in excluding Yaros' expert testimony. Civil Rule 26(a)(2) required Miller to disclose Yaros as her expert and provide a report disclosing Yaros' expert opinion no later than

28

90 days before the date set for trial. At trial, Miller admitted that she did not comply with Civil Rule 26(a)(2). At one point, Miller admitted that Yaros' testimony was not disclosed until the parties' exchanged exhibits and witness declarations on or about March 14, 2011, eight days before trial. At another point, Miller insisted that Yaros was identified as her expert witness on March 8, 2011, fourteen days before trial.[16]

Civil Rule 37(c)(1) makes clear that the court should exclude such expert testimony when the proponent does not comply with the requirements of Civil Rule 26(a) or (e), unless the proponent establishes that the failure to comply was justified or was harmless. See Daniel v. Coleman Co., Inc., 599 F.3d 1045, 1049 (9th Cir. 2010); Torres v. City of Los Angeles, 548 F.3d 1197, 1212-13 (9th Cir. 2008). The purpose of this exclusionary rule is to give teeth to the disclosure requirements of Civil Rule 26(a) "by forbidding the use at trial of any information required to be disclosed . . . that is not properly disclosed." Yeti by Molly, Ltd., 259 F.3d at 1106.

Here, when the bankruptcy court confronted Miller about her noncompliance with the disclosure requirements regarding her expert witness, Miller's only defense was that the disclosure requirements under Civil Rule 26(a)(2) should not apply at all,

---

[16]Presumably, Miller is relying on her unilateral proposed pretrial order, filed on March 8, 2011, which identified Yaros as her expert witness and referred the reader to Yaros' declaration (signed on March 7, 2011) for the subject matter of Yaros' testimony. It is not entirely clear precisely when Yaros' declaration was first made available to the court or to Gilliam, as it was not attached to the proposed pretrial order, but certainly it was made available no earlier than March 8, 2011.

29

because the court issued its trial setting order on December 20, 2010, which was roughly ninety days before the March 22, 2011 hearing date. While the length of time between the trial setting order and the date of trial likely justified some leeway on the deadline for complying with Civil Rule 26(a)(2) disclosures, we agree with the bankruptcy court that this length of time did not justify Miller's complete disregard of Civil Rule 26(a)(2). Nor did Miller attempt to make any showing at all that her failure to comply was harmless.

As a separate and independent ground for affirmance, Miller has not established that she was prejudiced by the exclusion of Yaros' testimony. Yaros' testimony contained no opinions that reasonably could have affected the court's finding on the dispositive issue regarding Gilliam's alleged intent to defraud. To the contrary, her testimony for the most part merely summarized the contents of the Bank Records and drew a handful of insignificant inferences regarding the flow of funds into and out of Account Number 1801. The types of inferences that Yaros drew from the records likely did not even necessitate expert testimony. The bankruptcy court was capable of drawing most of these inferences itself, to the extent they were even relevant to the issues presented at trial. Because the exclusion of Yaros' testimony was unlikely to have caused any harm to Miller's litigation position, the exclusion does not constitute reversible error under any circumstances. See Daniel, 599 F.3d at 1048-49 (citing Harper, 533 F.3d at 1030).

**C. Ruling Excluding Custodian of Records Testimony**

In an attempt to authenticate the Bank Records, Miller

30

offered at trial the declaration of Jennifer Long, who stated that she was the custodian of records for Bank of America and who further stated, in a pro forma manner, that the subject records were bank records produced in response to a subpoena served on the Bank.

The court excluded the Long Declaration for two reasons. First, it did not state the perjury law (California's, the United States' or some other jurisdiction) under which the declarant was asserting that her statements were true. Second and more importantly, the court had ordered each party to ensure that each witness whose direct testimony they offered by declaration was present in person at the time of trial so that they would be available for cross-examination. According to Miller, she had issued a trial subpoena for Bank of America's custodian of records, who she thought would be Jennifer Long. But Bank of America sent someone other than Jennifer Long to the hearing, a different custodian of records by the name of Jeffrey Jackson. Because Jeffrey Jackson's direct testimony had not been submitted in advance of the hearing by declaration, as required by the court, the court refused to let Jeffrey Jackson testify.

Miller asserts that the bankruptcy court erred by refusing to let Jeffrey Jackson testify to authenticate the Bank Records. To some extent, we agree with Miller on this point. The record suggests that Miller might not have had any means to control who Bank of America sent to act as custodian of records at the hearing. We understand the bankruptcy court's desire to have all direct testimony submitted in the form of declaration, but that might not always be a realistic demand to place on the parties

31

when a party subpoenas for testimony at trial a third party custodian of records who is an employee of an institution over whom that party has little or no control.

However, even if we were to assume that the court erred in not letting Jeffrey Jackson testify in person to authenticate the Bank Records or, alternately, erred by not admitting the custodian of records declaration of Jennifer Long, once again, there is no indication that these evidentiary rulings prejudiced Miller's case against Gilliam. To the contrary, the bankruptcy court admitted the Bank Records into evidence at the time of trial. Moreover, the Bank Records were, at best, tangentially related to the dispositive issue of Gilliam's intent. As explained above, the best indication of Gilliam's intent was his own trial testimony and the bankruptcy court's contemporaneous assessment of his credibility. Nothing in the Bank Records under any circumstances was likely to have altered the court's finding regarding Gilliam's intent, regardless of whether someone from Bank of America had formally authenticated the Bank Records, either in person or by declaration. Simply put, any error respecting the exclusion of the custodian of records testimony did not prejudice Miller and thus does not constitute reversible error. See Daniel, 599 F.3d at 1049; Harper, 533 F.3d at 1030.

**III. The Bankruptcy Court Did Not Commit Reversible Error When it Awarded Gilliam Attorneys Fees Under § 523(d).**

Section 523(d) provides:

> If a creditor requests a determination of
> dischargeability of a consumer debt under subsection
> (a)(2) of this section, and such debt is discharged,
> the court shall grant judgment in favor of the debtor
> for the costs of, and a reasonable attorney's fee for,

32

the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

To support a request for attorneys fees under § 523(d), a debtor needs to prove: (1) that the creditor sought to except a debt from discharge under § 523(a)(2), (2) that the subject debt was a consumer debt, and (3) that the subject debt ultimately was discharged. Stine v. Flynn (In re Stine), 254 B.R. 244, 249 (9th Cir. BAP 2000). "Once the debtor establishes these elements, the burden shifts to the creditor to prove that its actions were substantially justified." Id.

The bankruptcy court granted Gilliam's request for $27,788.24 in fees after simply finding that Miller's § 523(a)(2)(B) claim "was not well founded." Hr'g Tr. (11/29/10) at 93:14.

In her opposition to Gilliam's § 523(d) fee request, Miller had argued that Gilliam's fee request should be denied because her § 523(a)(2)(B) claim was substantially justified. Miller also argued that the fees requested were unreasonably excessive. In her appeal brief, Miller appears to raise essentially the same arguments challenging the bankruptcy court's fee award that her counsel argued in the bankruptcy court. We will consider each of these arguments in turn.[17]

---

[17]To the extent that Miller could have raised other arguments challenging the fee award, she has waived them because she did not raise them either in the bankruptcy court or on appeal. See In re Belice, 461 B.R. at 569 n.4.

33

### A. Substantial Justification

A creditor is "substantially justified" in bringing a § 523(a)(2) claim if the claim has a "reasonable basis both in law and in fact." In re Hunt, 238 F.3d at 1103. In challenging the court's determination of no substantial justification, Miller relies on the same grounds she relied on to challenge the bankruptcy court's summary judgment ruling against her § 523(a)(2)(B) claim.

As we previously explained, Miller argued that the Advertisement and the Lease constituted statements respecting Gilliam's financial condition for purposes of § 523(a)(2)(B), but under the narrow interpretation of the phrase "statement respecting the debtor's financial condition" we adopted in Belice, both of those documents clearly are not statements respecting financial condition.

Although Belice only recently construed the meaning of the phrase "statement respecting financial condition," there can be no doubt that the Lease and the Advertisement were not statements respecting the debtor's financial condition under any reasonable interpretation of that term. See generally In re Belice, 461 B.R. at 574 (describing scope of broad interpretation). Simply put, neither the Lease nor the Advertisement purported to describe any aspect of Gilliam's finances. As such, neither document could qualify under any recognized standard as a statement respecting the debtor's financial condition for purposes of § 523(a)(2)(B).

Consequently, we perceive no error in the bankruptcy court's determination that Miller was not substantially justified in

34

bringing her claim under § 523(a)(2)(B).

**B.  Reasonableness of Fees Requested**

We begin our review of the bankruptcy court's finding on the reasonableness of Gilliam's fees by noting that, under the abuse of discretion standard, we may not "substitute our judgment for that of the [bankruptcy] court." <u>Hinkson</u>, 585 F.3d at 1251; <u>see also</u> <u>Nat'l Hockey League v. Metro. Hockey Club, Inc.</u>, 427 U.S. 639, 642 (1976) (per curiam) (holding that, under abuse of discretion standard, question is not what the appellate court would have decided in the first instance but rather whether the trial court abused its discretion in what it decided). Furthermore, we reiterate that we may not reverse the bankruptcy court's finding that Gilliam's fees were reasonable unless that determination was "illogical, implausible, or without support in the record." <u>In re Retz</u>, 606 F.3d at 1196.

According to Miller, Gilliam's fees were excessive because Gilliam's counsel charged too much for his services in connection with Gilliam's summary judgment motion, and because roughly $17,000 of the fees requested (by Miller's reckoning) were attributable to discovery disputes caused by Gilliam's failure to cooperate with the discovery process.  However, in ruling on the fee request, the court had before it only one declaration:  the declaration of Gilliam's counsel Todd Turoci, and attached to his declaration was his itemized statement of the services provided and time expended in defending against both the § 523(a)(2)(B) claim and the § 727 claims, in the total amount of $55,576.47. Of this amount, Turoci estimated that at least half of the fees were attributable to his defense against the § 523(a)(2)(B)

35

claim, and so he requested a fee award of $27,788.24. In his declaration, Turoci admitted that the cost of defending against all of the claims went well beyond what it should have cost in an ordinary case, but unlike Miller, he attributed the additional cost to Miller's discovery practices and the manner in which she prosecuted her claims. The bankruptcy court had first-hand knowledge of the conduct of both parties in litigating the underlying adversary proceeding. We thus give significant deference to the bankruptcy court's assessment of the reasonableness of the fees requested because the bankruptcy court was in the best position, in light of its first-hand knowledge of the litigation, to make that assessment. See Gill v. Wittenburg (In re Fin. Corp. of America), 114 B.R. 221, 224 (9th Cir. BAP 1990).

Moreover, Miller's appeal brief has not pointed us to anything demonstrating that the court's assessment of the reasonableness of the fees was clearly erroneous. Nor can we conclude, after conducting our own review of the record, that the bankruptcy court's reasonableness finding was illogical, implausible or not supported by the record. Accordingly, we uphold the bankruptcy court's award of fees under § 523(d), in the amount of $27,788.24.

## CONCLUSION

For all of the reasons set forth above, we AFFIRM the bankruptcy court's summary judgment rulings, its judgment after trial, and its award of fees under § 523(d).

36